O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DAVID RAMIREZ,                    )          Case No. CV 16-03755-KES

                    Plaintiff,    )

          v.                      )

                                  )          MEMORANDUM OPINION

NANCY A. BERRYHILL, Acting        )          AND ORDER

Commissioner of Social Security,  )

                    Defendant.    )

                                  )

_____

**I.**

**BACKGROUND**

In June 2012, Plaintiff David Ramirez ("Plaintiff") applied for Supplemental Security Income ("SSI") alleging disability beginning July 15, 2010. Administrative Record ("AR") 30, 167-69. The Administrative Law Judge ("ALJ") convened a hearing on October 2, 2014, at which Plaintiff, who was represented by a lawyer, appeared and testified. AR 44-63. Plaintiff's counsel told the ALJ that Plaintiff is "disabled mostly due to mental health reasons." AR 47.

On November 20, 2014, the ALJ issued a written decision denying Plaintiff's request for benefits. AR 30-42.

The ALJ found that Plaintiff suffers from the severe impairments of obesity, hernia, depressive disorder, and anxiety disorder. AR 31, 37. Despite these impairments, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to carry up to twenty pounds occasionally, ten pounds frequently, sit or stand/walk for six hours of an eight-hour workday, and occasionally crouch or climb. AR 32, 37. As non-exertional limits, the ALJ found that Plaintiff is limited to simple, repetitive tasks, no face-to-face public contact, only occasional contact with supervisors and co-workers, and no fast-paced assembly-type work. Id.

Based on this RFC and the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform his past relevant work as a call center clerk, which the Dictionary of Occupational Titles ("DOT") classifies as "information clerk, transportation," DOT code 237.367-018. AR 36-37. The ALJ therefore concluded that Plaintiff was not disabled. AR 38.

Plaintiff now raises eight claims of error. Dkt. 31, Joint Stipulation ["JS"] at 21. The Court discusses each, below, and AFFIRMS the ALJ's decision.

## II.

## DISCUSSION

**A.** **ISSUE ONE: Did the ALJ give adequate reasons for rejecting medical opinions from Plaintiff's treating sources?**

Plaintiff contends that the ALJ failed to explain adequately her rejection of "Treating sources Huthsteiner, Lletget, and [Yegiazaryan]." JS at 47.

### 1. The Treating Physical Rule.

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did not treat or examine the plaintiff. See 20 C.F.R. § 404.1527(c); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). A

treating physician's opinion is generally entitled to more weight than that of an examining physician, which is generally entitled to more weight than that of a non-examining physician. Lester, 81 F.3d at 830. Thus, the ALJ must give specific and legitimate reasons for rejecting a treating physician's opinion in favor of a non-treating physician's opinion or an examining physician's opinion in favor of a non-examining physician's opinion. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citing Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)); Lester, 81 F.3d at 830-31 (citing Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983)).

If the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons. Lester, 81 F.3d at 830 (citing Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)). However, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The factors to be considered by the adjudicator in determining the weight to give a medical opinion include: "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. Orn, 495 F.3d at 631 (quoting 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

### 2. Overview of Plaintiff's Medical Treating Source Records.

Dr. Conny Huthsteiner and social worker/therapist Valeria Lletget are both associated with the San Fernando Mental Health Center ("SFMHC"), part of the Los Angeles County Department of Mental Health. Ms. Lletget completed Plaintiff's initial assessment at SFMHC in April 2012. AR 383-87. On May 1, 2012, Plaintiff was assigned to psychiatrist Dr. Huthsteiner "for medication and treatment support services." AR 390, 407.

Dr. Huthsteiner complete two "complex medication support service" reports

3

in June and August 2012.  AR 434-37.  In the June 2012 report under "assessment," Dr. Huthsteiner noted that Plaintiff exhibited "symptoms of depression and PTSD" and "may be borderline MR [mentally retarded]."  AR 437. She also noted that Plaintiff has a "probable binge eating disorder and is severely morbidly obese."  Id.  After noting that Plaintiff would start Wellbutrin and Ativan/Lorazepam, Dr. Huthsteiner opined that Plaintiff "needs to attend groups to address relationship/behavioral issues."  Id.

In the August 2012 report, Dr. Huthsteiner noted Plaintiff "feels his anxiety is a little better" and "feels he is less angry.  Being pushed by a friend to return to work."  AR 434.  She also noted, "Pt improving on meds. … Pt doesn't want to take an antipsychotic at this time ….  Nevertheless, I have made a prescription available to him to use should he find it useful."  Id.  She also noted that Plaintiff had no psychiatric hospitalizations and no "Hx" [history] of psychiatric treatment. AR 435.

Psychiatrist Dr. Lilit Yegiazaryan was later assigned to Plaintiff's care team, replacing Dr. Huthsteiner.  AR 523.  It appears (although the signature is illegible) that Dr. Yegiazaryan completed similar medication support reports in October 2012, January 2013, and April 2013.  AR 429-33.  Similar reports were also completed in August and November 2013.  AR 513-15.  The record also contains 2014 typed progress notes from Dr. Yegiazaryan.  AR 516-18.  In those notes, Dr. Yegiazaryan generally recorded that Plaintiff was doing better on medications and reported no side effects.  Id.  At the hearing, Plaintiff testified that he saw Dr. Yegiazaryan "just for medication."  AR 51.

### 3.    The ALJ's Discussion of the SFMHC Evidence.

The ALJ began her analysis by noting that for mental impairments, she was more concerned about identifying their effects on Plaintiff's functioning rather than labeling them with a precise diagnosis.  AR 31.  The ALJ emphasized that she considered Plaintiff as a "whole person," including the interplay between all his

4

medically determinable impairments and their symptoms, whether physical or mental. Id.

The ALJ found that Plaintiff's depression and anxiety are both "severe" impairments. AR 31. The ALJ discussed SFMHC's treating records. AR 33-36, citing exhibits 3F (AR 380-394), 5F (AR 399-437), and 9F (AR 513-18). The ALJ summarized Dr. Yegiazaryan's 2014 treatment records. AR 36. The ALJ also discussed Ms. Lletget's opinions concerning Plaintiff's mental health, both as documented in her progress notes and a Mental Disorder Questionnaire that she completed in May 2013. Id.

The ALJ ultimately "concur[ed] with Ms. Lletget to an extent" and therefore assessed "major functional limitations in [Plaintiff's] ability to socialize, the limitation to simple repetitive work (e.g., attaching to problems with changes in routine) and in precluding his ability to handle fast-paced assembly work (e.g., due to the likelihood of heightened anxiety)." AR 36. The ALJ put all these restrictions in Plaintiff's RFC. AR 37.

### 4. Analysis of Plaintiff's Claimed Errors.

#### a. Dr. Huthsteiner.

Plaintiff contends that the ALJ erred by failing to address Dr. Huthsteiner's opinions. JS at 40. While the ALJ's decision does not mention Dr. Huthsteiner's name, it does discuss SFMHC's records. The ALJ also discussed Ms. Lletget's progress notes, and Plaintiff admits, "Lletget merely reiterated the same diagnoses [as] Huthsteiner." JS at 26.

Plaintiff contends that the ALJ needed to give reasons for rejecting Dr. Huthsteiner's initial assessment that Plaintiff exhibited "symptoms of depression and PTSD" and "may be borderline MR." JS at 40, citing AR 437. The ALJ, however, did not "reject" the medical evidence that Plaintiff suffers from depression and post-traumatic stress disorder. To the contrary, she found that Plaintiff suffers from the severe impairments of depressive disorder and anxiety

5

disorder.  AR 37.  She noted that Plaintiff's childhood abuse "might support a diagnosis of PTSD," but felt she had adequately addressed the effect of Plaintiff's mental impairments on his functioning regardless of their label.  AR 31, 33. Plaintiff has not suggested what restrictions the ALJ should have included in his RFC based on Dr. Huthsteiner's opinions beyond those that the ALJ included, i.e., limitations (1) to simple, repetitive work, (2) on social interactions, and (3) against fast-paced work.  AR 37.

Regarding mental retardation, even if the ALJ had accepted Dr. Huthsteiner's initial impression as a diagnosis, Plaintiff does not persuasively explain how an RFC limited to "simple, repetitive tasks" does not account for Plaintiff's cognitive difficulties.  Plaintiff argues that the ALJ erred in finding he could perform even simple, repetitive work because he was laid off from "a simple repetitive" call center job for being "too slow."  JS at 71, citing AR 192 (when asked to explain why he stopped working, Plaintiff said "change in management and he was too slow").  The ALJ, however, found that Plaintiff *could* do the call center job for four or five years and was laid off when the company moved, not for performance reasons.  AR 33.  This finding is supported by substantial evidence – i.e., Plaintiff's own hearing testimony.  AR 48-49, 50, 59-60 (cited and discussed below).  The ALJ was entitled to rely on Plaintiff's hearing testimony that he could do the call center job (both then and now) and therefore Plaintiff's mental impairments do not prevent him from doing even simple, repetitive tasks.

Plaintiff argues, "Huthsteiner noted that [Plaintiff] was not even able to live independently."  JS at 77, citing AR 435.  In fact, the cited record is from Dr. Huthsteiner's first encounter with Plaintiff and merely notes that Plaintiff "has always lived with his parents."  AR 435.  This is a far cry from a medical opinion that Plaintiff cannot live independently.

The JS discusses many patient history facts recorded by Dr. Huthsteiner and others at SFMHC, such as that Plaintiff has an abusive family, required special

6

education services to complete high school, and is ashamed of his weight. Such patient history facts are not medical opinions, and the ALJ had no obligation to give reasons for "rejecting" them. In any event, the ALJ did not disbelieve Plaintiff's self-reported history; she incorporated much of it into her decision. AR 30 (discussing special education), AR 33 (discussing abuse), AR 35 (discussing symptoms Plaintiff reported to SFMHC).

                b.     Dr. Yegiazaryan.

The JS fails to identify a single opinion by Dr. Yegiazaryan in the record before the ALJ that would have required a different RFC, had the ALJ adopted it.

The JS states, "Robinson, Lletget, and Yegiazaryan gave [Plaintiff] low GAF scores in the 40s, which are listing level and, and presumptively indicate that he is disabled and cannot engage in substantial gainful employment. (AR 380, 456-60, 294-95)." JS at 77. In fact, while AR 380 is a record from Robinson and AR 456-60 are records from Lletget, AR 294-95 are not records from Yegiazaryan. Rather, AR 294-95 is a post-hearing letter brief written by Plaintiff's counsel summarizing a February 24, 2015 opinion by Dr. Yegiazaryan (i.e., an opinion written *after* the ALJ's November 20, 2014 decision). Plaintiff's argument that this Court should consider Dr. Yegiazaryan's February 24, 2015 opinion as new evidence is discussed below under Issue Seven.

                c.     Social Worker/Therapist Lletget.

Social workers are generally not an "acceptable medical source." See 20 C.F.R. § 404.1513(a) (listing acceptable medical sources). An opinion from a person who is not an acceptable medical source need not be afforded any deference by the ALJ. See Bunnell v. Sullivan, 912 F.2d 1149, 1152 (9th Cir. 1990), rev'd en banc on other grounds, 947 F.2d 341 (9th Cir. 1991). A social worker can be an acceptable medical source, but only if the social worker acts as an agent of a licensed physician or psychologist. Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996). This occurs where the social worker acts so "closely under the

supervision" of the treating physician that the social worker's opinion should be "properly considered as part of the opinion" of the treating physician. Id. at 971.

Plaintiff appears to argue that Ms. Lletget's opinions should be considered part of Dr. Huthsteiner's opinions under this "agency" rule, asserting that Ms. Lletget "merely reiterated the same diagnoses of board-certified treating psychiatrist Huthsteiner, who unequivocally is an acceptable medical source." JS at 26. This argument does not demonstrate error for at least two reasons. First, Plaintiff has not identified evidence (beyond working at SFMHC) that Dr. Huthsteiner closely supervised Ms. Lletget. Plaintiff saw Ms. Lletget before meeting Dr. Huthsteiner, and Dr. Huthsteiner's role on Plaintiff's care team appears to have been providing prescriptions and medication support services. Second, as discussed above, Plaintiff has not demonstrated that the ALJ's RFC determination failed to account for any of Dr. Huthsteiner's opinions, which Plaintiff argues are essentially the same as Ms. Lletget's. The ALJ included "major functional limitations" in Plaintiff's RFC due to Ms. Lletget's progress notes. AR 36.

Plaintiff also argues that the ALJ should have considered Ms. Lletget an acceptable medical source because 20 C.F.R. § 404.1513(d)(1) "specifically states that 'therapists' and others are acceptable medical sources (and such sources have been fully elevated to the status of treating sources under the new regulations.)." JS at 26. When the ALJ wrote her decision in 2014, the cited regulation provided that the only sources who can provide "evidence to establish an impairment" are "acceptable medical sources." 20 C.F.R. § 404.1513(a). The regulation then listed all acceptable medical sources, which were licensed physicians, psychologists, optometrists, podiatrists, and speech-language pathologists. Id. The regulation also explained that the agency may consider evidence from "other sources" concerning the severity of a claimant's impairments. 20 C.F.R. § 404.1513(d). Such "other sources" included other "medical sources" such as nurse-practitioners,

chiropractors, audiologists, and therapists. 20 C.F.R. § 404.1513(d)(1). "Other" sources also included "non-medical sources" such as clergy and family members. 20 C.F.R. § 404.1513(d)(4). Thus, the 2014 version of section 404.1513 did ***not*** identify therapists as "acceptable" medical sources; they were identified as "other" medical sources.

The Social Security Administration has amended certain regulations, effective March 27, 2017, including by broadening the scope of acceptable medical sources to include advanced practice registered nurses, audiologists, and physician assistants. See 20 C.F.R. § 404.1502(a), (d), (e) (2017). The 2017 amendments do not make therapists or social workers acceptable medication sources. Id. Even if they did, Plaintiff has not advanced an argument that they governed the ALJ's 2014 decision. The presumption is against retroactive application.[1] See Lowry v. Astrue, 474 Fed. Appx. 801, 805 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); Duran v. Berryhill, No. 16-7416, 2017 WL 2588069, at *3 n.3 (C.D. Cal. June 14, 2017) (citing same cases for same proposition).

For all these reasons, the ALJ did not err by declining to apply the treating physician rule to Ms. Lletget.

**B.**     **ISSUE TWO:  Did the ALJ give adequate reasons for rejecting Plaintiff's testimony?**

**1.**     **Rules for Assessing the Claimant's Testimony.**

Generally, "[i]f the ALJ finds that the claimant's testimony as to the severity of his pain and impairments is unreliable, the ALJ must make a credibility

---

[1] Accordingly, citations to applicable regulations herein are to regulations in effect at the time of the ALJ's decision, unless otherwise noted.

9

determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas, 278 F.3d at 958. An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). The ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citation omitted).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036. If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester, 81 F.3d at 834; Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014). The ALJ must consider a claimant's work record, observations of medical providers and third parties with knowledge of claimant's limitations, aggravating factors, functional restrictions caused by symptoms, effects of medication, and the claimant's daily activities. Smolen, 80 F.3d at 1283-84 & n.8. "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." Burch v. Barnhart,

400 F.3d 676, 681 (9th Cir. 2005).

**2.    The ALJ's Reasons for Discounting Plaintiff's Testimony.**

The ALJ gave multiple reasons for discrediting Plaintiff's claim that his mental health symptoms render him unable to work.  AR 32-34.  Those reasons include (1) Plaintiff's hearing testimony was inconsistent with his claim of disability, (2) Plaintiff's hearing testimony was inconsistent with statements given to his health care providers, (3) Plaintiff has received limited mental health treatment, in response to which he improved, (4) discrepancies between Plaintiff's 2012 and 2013 Adult Function reports suggest that Plaintiff minimized his activities in the latter, and (5) Plaintiff's poor work history and recurring travel to Mexico suggest a lack of motivation to work.  Id.

a.    Reason One: Plaintiff's Hearing Testimony.

Plaintiff testified about his ability to perform his past relevant work as a transportation information clerk at a call center, as follows:

Q:    How long did you do [the job of call taker]?

A:    Five years.

Q:    What was the reason that you left?

A:    The company moved to another company.  …

Q:    When you were there did you have any problems doing that job?

A:    At that time, no.

AR 48-49.

Q:    If somebody offered you the same job that you had … before, which was being on the phone, would you be able to do that?

A:    Yes, but I think it will come with – it will be more difficult now.

Q:    Why is that?

A:    Because of mental situation.  … I don't like to be around people.

…

Q:    Did you have any trouble communicating with the people that

11

needed rides?

A:   No, not at that time. …

Q:   So you said if they offered you your old job back, you probably could do it, but you would have problems with other people, right?

A:   I would have problems being around people.

Q:   What if they offered you a job where there wouldn't be other people around?  You would just have tasks to do. …  [W]ould you be able to maintain such a job five days a week?

A:   Yes and no.

Q:   What do you mean by no?

A:   … I could do the job, but I don't know if mental like if I could be … like enclosed or something.  I don't know.

Q:   It doesn't necessarily have to be enclosed.  You wouldn't be dealing with other people ….  So would you be able to maintain such a job five days a week?

A:   Yes.

Q:   And   you   wouldn't   miss   any   time   from   work?

A:   I would miss.

Q:   How many days in a typical week you think you would miss?

A:   Three.

Q:   Why so much?

A:   I don't know, because of my mental situation … and physical.

AR 56, 59-60.

The ALJ cited this testimony and relied on it to conclude that Plaintiff could perform the mental demands of his prior work and was not fired due to poor performance.  AR 33.  The ALJ reasoned that Plaintiff's mental abilities have not deteriorated, because his depression and anxiety arise from childhood abuses that occurred before he worked at the call center.  AR 33, 35.  Furthermore, Plaintiff

initially testified that he could do his prior work even today but with difficulty due to his dislike of being around people, and the VE testified that he could do his prior work with no face-to-face public contact and only occasional interaction between Plaintiff and his coworkers. AR 61. Thus, the ALJ did not err in citing Plaintiff's above-quoted hearing testimony as inconsistent with his claim of disability.

b.   <u>Reason Two</u>: Plaintiff's Hearing Testimony Compared to His Treatment Records.

The ALJ stated that Plaintiff's "testimony of current side effects – on a now established regimen of Zoloft and Ativan – is countered by his multiple denials of this, including only a few months prior to his testimony." AR 33, citing AR 514, 516-518. The records cited by the ALJ are (1) 08/12/13 SFMHC record saying "current medication side effects Ø" (AR 514); (2) 07/29/14 progress notes from Dr. Yegiazaryan saying "he denies SE from meds" (AR 516); (3) 05/12/14 progress notes from Dr. Yegiazaryan saying "No SE reported" (AR 517); (4) 02/04/14 progress notes from Dr. Yegiazaryan saying "Good/no SE" (AR 518).

The ALJ also cited a questionnaire Plaintiff completed on May 8, 2013. AR 43, citing AR 263-270. In response to a question specifically about medication side effects, Plaintiff failed to indicate that he suffered from any side effects. AR 270.

In contrast, when asked at the October 2, 2014 hearing if he suffers from any side effects from Lorazepam and Zoloft, Plaintiff responded, "Yeah. It makes me dizzy and dry mouth or vision impaired." AR 52-53.

Thus, the ALJ's finding of a credibility-impairing inconsistency is supported by substantial evidence. One inconsistent statement is a sufficiently clear and convincing reason to discount a claimant's credibility. <u>Martin v. Berryhill</u>, No. 15-01660, 2017 U.S. Dist. LEXIS 39819, at *35 (E.D. Cal. Mar. 17, 2017).

/ / /

/ / /

c. <u>Reason Three</u>: Plaintiff's Limited Mental Health Treatment and Improvement.

The ALJ noted that Plaintiff "has not had any psychiatric hospitalizations and did not seek psychiatric treatment until 2012" despite an alleged onset date of 2010. AR 33. The ALJ then cited several treating records from 2013 and 2014 reporting that Plaintiff was doing better. <u>See, e.g.</u>, AR 513 (11/04/13 record that Plaintiff is "doing well" and "less depressed"); AR 515 (08/12/13 record that Plaintiff "does better on meds"); AR 517 (05/12/14 record saying Plaintiff is "doing well").

"Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." <u>Hampton v. Astrue</u>, No. 10-00884, 2011 U.S. Dist. LEXIS 52704, at *29-30 (E.D. Cal. May 6, 2011) ("[M]edication management of Plaintiff's pain was clear and convincing reason for finding Plaintiff's subjective complaints lacked credibility."). So too here, the ALJ did not err in citing Plaintiff's limited prior treatment and improvement upon receiving medication as a reason to doubt his testimony that his mental impairments render him unable to work.

d. <u>Reason Four</u>: Discrepancies between Plaintiff's Function Reports.

In September 2012, Plaintiff reported activities such as feeding his dogs and cleaning his room. AR 208, 210. He reported "no problem" with personal care other than tying his shoes. AR 209. His "hobby" was watching TV. AR 212. He went to Walmart once a month to shop. AR 211. He traveled either by public transportation or riding in a car. AR 211. Responding to a checklist, he did not indicate any issues with memory, completing tasks, or getting along with others. AR 213. He reported he got along "OK" with authority figures. AR 214.

In May 2013, Plaintiff was still able to feed his dog and clean his room. AR 264-65. He noted problems, however, with personal care such as it "takes a long

time" to dress, he "can't bathe as well," his bad vision makes it "hard to shave" and he has trouble feeding himself because he "can't chew; have broken teeth." AR 264. He indicated he did not use public transportation. AR 266. He indicated he had no hobbies, not even watching TV. AR 267. He never went shopping. AR 266. For this check-the-box list, he indicated he had problems with memory, completing tasks, and getting along with others. AR 268. He left blank the question asking about getting along with authority figures. AR 269.

Comparing these two reports, the ALJ correctly observed that the 2013 report describes extreme limitations that are much more serious than those described a mere few months earlier. Thus, substantial evidence supports that ALJ's conclusion that Plaintiff was "minimizing" his activities in 2013 when reporting them to the Commissioner.

Having determined that the ALJ provided four clear and convincing reasons to discount Plaintiff's credibility, the Court declines to analyze the other reasons offered.

**C.** **ISSUE THREE: Did the ALJ err in determining that Plaintiff can perform (i) exertionally light work and (ii) his past relevant work?**

**1.** **Rules for Determining a Claimant's RFC.**

A claimant's RFC is an assessment of his ability to do sustained, work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours a day, for five days a week, or equivalent work schedule. SSR 96-8p, 1996 SSR LEXIS 5. The RFC assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. Id. In determining a claimant's RFC, the ALJ should consider those limitations for which there is support in the record, but the ALJ need not consider properly rejected evidence of non-severe impairments or subjective complaints. Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) ("Preparing a function-by-function analysis for medical

conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary."); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) ("The ALJ was not required to incorporate evidence from the opinions of Batson's treating physicians, which were permissibly discounted.").

### 2. The ALJ's RFC Determination and Plaintiff's Claimed Errors.

Plaintiff's primary contention is that the ALJ was required to include an attendance limitation in Plaintiff's RFC to reflect his capacity to sustain employment accurately. Plaintiff repeatedly cites his own hearing testimony that he would miss three days of work each week. JS at 62, 65-66, 68, citing AR 60. Not surprisingly, the VE testified that a person who misses work 3/5 of the time cannot maintain gainful employment. AR 62.

Plaintiff, however, does not point to any medical opinion that he would miss work three days each week, particularly if his job were not fast-paced and did not require much interaction with other people. His own hearing testimony initially was that he *could* maintain a job five days a week. AR 59. When asked leading questions by his lawyer, he testified he would sometimes miss work, then clarified that he would miss three days each week. AR 59-60. When asked to explain this answer, he could not. AR 60.

The ALJ found Plaintiff's testimony not credible for the reasons discussed above. She expressly found that missing three days per week "does not approach describing this claimant who, within the parameters of the assessed RFC, can work day in, day out and week in, week out." AR 37. The ALJ did not err by citing (1) inconsistencies in Plaintiff's self-reported limitations and (2) the fact that Plaintiff was not fired from his call center job for performance problems (like excessive absenteeism[2]) as reasons to reject Plaintiff's assertion that he cannot

---

[2] Plaintiff described his call center job as 8 hours per day, 6 days per week. AR 230.

work fulltime.

Plaintiff also argues that the ALJ failed to consider that Plaintiff's anxiety disorder and other mental impairments render him "basically unable to leave his room of his parents' house." JS at 66, 69. Again, the ALJ disbelieved that testimony, and her rejection of it is supported by substantial evidence. Evidence in the record shows that Plaintiff, when sufficiently motivated, leaves his house. He did so to attended his call center job, go to Mexico, go to Walmart, and go to SFMHC. AR 405, 221. In 2012, his mother stated that he goes out about once a month, but he lacks "desire to do anything." AR 223-24.

Finally, Plaintiff contends that the ALJ misevaluated the medical evidence when she concluded that he can perform light work[3] despite his obesity and hernia. JS at 63. As evidence of his exertional limitations, the JS cites to AR 254-55, 280-81, which are all forms containing Plaintiff's self-reported limitations. Id. As discussed above, the ALJ gave valid reasons for discounting Plaintiff's testimony.

The one consultative examiner who gave medical opinions about Plaintiff's exertional abilities is Dr. Seung Ha Lim, MD. Dr. Lim based his opinions on "formal testing and on observation." AR 396. Per Dr. Lim, Plaintiff can sit, stand or walk for 6 hours and lift/carry 25 pounds frequently consistent with medium work. AR 398. The ALJ found that Dr. Lim provided "the most comprehensive evidence in the physical realm," but adopted an RFC that was more restrictive, consistent with light work. AR 34, 37. Plaintiff has not shown that the ALJ erred in evaluating the medical evidence to determine Plaintiff's RFC.

///

_____

[3] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Light work may require "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." Id.

### 3. Step Four of the Sequential Evaluation Process.

At step four of the sequential analysis, the claimant has the burden to prove that he cannot perform his prior relevant work "either as actually performed or as generally performed in the national economy." Carmickle v. Comm'r of SSA, 533 F.3d 1155, 1166 (9th Cir. 2008) (citation omitted). "Although the burden of proof lies with the claimant at step four, the ALJ still has a duty to make the requisite factual findings to support his conclusion." Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001) (citations omitted). The ALJ must make specific findings as to: (1) "the claimant's residual functional capacity"; (2) "the physical and mental demands of the past relevant work"; and (3) "the relation of the residual functional capacity to the past work." Id. at 845 (citing SSR 82-62, 1982 SSR LEXIS 27).

Social Security Regulations name two sources of information that may be used to define a claimant's past relevant work as actually performed: a properly completed vocational report and the claimant's own testimony. SSR 82-41 and 82-61. The best source for how a job is generally performed is usually the DOT. See Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995); 20 C.F.R. §§ 404.1566(d) and 416.966(d); Soc. Sec. Rul. No. 82-61. For an ALJ to accept VE testimony that contradicts the DOT, the record must contain "persuasive evidence to support the deviation." Johnson, 60 F.3d at 1435.

An ALJ need not specify if his or her step four finding that a claimant can perform past relevant work is based on the work as actually performed or as generally performed, so long as there is substantial evidence in the record to support the ALJ's finding on one of those two grounds. Pinto, 249 F.3d at 845-46.

### 4. The ALJ's Findings Regarding Plaintiff's Past Relevant Work.

Regarding the physical and mental demands of Plaintiff's past relevant work, the ALJ received testimony from a VE that DOT code 237.367-018 describes Plaintiff's past relevant work. AR 61. The VE testified that a person with all the limitations in Plaintiff's RFC *except* the limitation to simple, repetitive

tasks could do that work both "per the DOT and as performed." Id.  The ALJ asked if his testimony would change if the ALJ added a restriction to simple, repetitive tasks. Id.  The VE responded that it would not, because DOT code 237.367-018 "has an SVP of 2, which is unskilled." Id.  The ALJ then incorporated this testimony into her analysis, as follows:

> [The VE] testified that an individual having this claimant's medical/vocational profile could perform this work.  He explained, in effect, his opinion is consistent with the DOT and, to the extent no specifically addressed by it (e.g., type of public contact, pace), based on his knowledge and experience.  The ALJ defers to [the VE's] expertise ….

AR 36-37.  From this, the ALJ concluded that Plaintiff's limitations do not preclude him from performing his past relevant work as a transportation information clerk.  Id.

The ALJ did not make any express findings about whether this job, as Plaintiff actually performed it, is consistent with a limitation to simple, repetitive tasks.  The ALJ cited to Plaintiff's description of his job duties.  Id., citing AR 230.  In that form, Plaintiff explained that he was a "lead call taker" and supervised fifteen people.  AR 230.  He was required to answer the phone and fax machines and provide "customer services."  Id.

The ALJ did, however, find that whatever the mental demands of Plaintiff's past work might have been, he could do them, because he held that job for several years and was ultimately let go for reasons unrelated to his job performance.  AR 33 (citing Plaintiff's hearing testimony).  The ALJ further found that the limiting effects of Plaintiff's mental impairments are not worse now than they were when he was working, citing 2013 and 2014 treatment records showing that Plaintiff reported improvement after starting medication therapy and the fact that he "links his [mental] problems to longstanding situations."  AR 35.

19

### 5.     The DOT's SVP and GED Ratings.

The DOT lists a specific vocational preparation ("SVP") time for each described occupation.  Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9.  A job's SVP level, however, does not address whether the job entails only simple, repetitive tasks.  <u>Carney v. Astrue</u>, 2010 WL 5060488, at *4 (C.D. Cal. Dec. 6, 2010).

A job's level of simplicity is addressed by its DOT general educational development ("GED") reasoning development rating.  The GED reasoning scale ranges from Level 1 (lowest) to Level 6 (highest).  The DOT defines the reasoning abilities corresponding with each of the first four levels, as follows:

<u>Level One</u>: Apply commonsense understanding to carry out simple one- or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

<u>Level Two</u>: Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

<u>Level Three</u>: Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal with problems involving several concrete variables in or from standardized situations.

<u>Level Four</u>: Apply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists.  Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form.  (Examples of rational systems include: bookkeeping, internal

20

combustion engines, electric wiring systems, house building, farm management, and navigation.)

See DOT, App. C.

Per the DOT, the job of transportation information clerk is classified as SVP 2 and GED 4.  See DOT 237.367-018.

### 6.    The Record Lacks Substantial Evidence to Support a Finding that Plaintiff Can Perform His Past Relevant Work as Generally Performed.

The Ninth Circuit has held that there is an apparent conflict between a RFC limitation to simple, repetitive tasks and the demands of Level 3 reasoning. Zavalin v. Colvin, 778 F.3d 842, 847 (9th Cir. 2015); see also Tafolla v. Colvin, No. 12-466, 2013 U.S. Dist. LEXIS 31934, at *12 (C.D. Cal. Mar. 6, 2013) (remanding where ALJ found claimant limited to simple tasks could work as a transportation call clerk).

Following this authority, Plaintiff's RFC limiting him to simple, repetitive tasks and the hypothetical posed to the VE incorporating that limitation are inconsistent with Plaintiff's past relevant work as described by the DOT.  The ALJ was required to ask the VE to explain the deviation, but she did not do because the VE testified that there was no deviation.  AR 61.  The VE only mentioned the job's SVP rating without discussing its GED reasoning requirements, then affirmed that his testimony was consistent with the DOT except for certain conditions not addressed by the DOT (i.e., the level of required social contact and pace) which were based on his experience.  Id.

When there is an apparent conflict between the vocational expert's testimony and the DOT — for example, expert testimony that a claimant can perform an occupation involving DOT requirements that appear more than the claimant can handle — the ALJ is required to reconcile the inconsistency.  The ALJ must ask the expert to explain the

conflict and then determine whether the vocational expert's explanation
for the conflict is reasonable before relying on the expert's testimony
to reach a disability determination.

Zavalin, 778 F.3d at 846.  Because none of this happened in the instant case, to the extent the ALJ found that Plaintiff can perform his past relevant work as it is generally performed, that finding is not supported by substantial evidence.

**7.  Substantial Evidence Supports the ALJ's Finding that Plaintiff Can Perform His Past Relevant Work as Actually Performed.**

Plaintiff admits that his call center job was a "simple repetitive job."  JS at 45.  As discussed above, Plaintiff testified that he could perform that job and was let go for reasons unrelated to his abilities.  AR 48-56.  He testified that he could still perform that job as of the date of the hearing.  AR 59-60.  While he expressed reservations about interacting with people and excessive absenteeism (after being led by his attorney), he never expressed any uncertainty about handling the reasoning demands of that job.  Id.  From this, the ALJ could conclude that Plaintiff's past work, as he actually performed it, was a simple, repetitive job consistent with his RFC.

Plaintiff argues that he was fired for being "too slow," suggesting his mental impairments ultimately prevented him from performing his past relevant work satisfactorily.  JS at 45, citing AR 192.  As discussed above, Plaintiff was asked at the hearing why he stopped working, and he did not identify any performance issues.  The ALJ was entitled to rely on Plaintiff's hearing testimony, particularly where Plaintiff bears the burden at Step Four to produce evidence that he cannot perform his past relevant work.

**D.  ISSUE FOUR:  Did the ALJ err in determining that Plaintiff does not satisfy Listing 12.04 or 12.06?**

**1.  Step Three of the Sequential Evaluation Process.**

The ALJ follows a five-step sequential evaluation process in assessing

whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4);

Lester, 81 F.3d at 828 n.5.  In the first step, the Commissioner must determine

whether the claimant is currently engaged in substantial gainful activity; if so, the

claimant is not disabled and the claim must be denied.  20 C.F.R.

§§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

 If the claimant is not engaged in substantial gainful activity, the second step

requires the Commissioner to determine whether the claimant has a "severe"

impairment or combination of impairments significantly limiting his ability to do

basic work activities; if not, a finding of not disabled is made and the claim must

be denied.  Id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

 If the claimant has a "severe" impairment or combination of impairments,

the third step requires the Commissioner to determine whether the impairment or

combination of impairments meets or equals an impairment in the Listing of

Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if

so, disability is conclusively presumed and benefits are awarded.  Id.

§§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

  **2.** **Listings 12.04 and 12.06.**

 Listing 12.04 covers affective disorders, such as depression or bipolar

disorders.  Listing 12.06 covers anxiety-related disorders, such as panic attacks or

agoraphobia.

 To meet Listing 12.04, a claimant must satisfy the requirements in both

Paragraphs A (medical criteria) and B (functional limitations), or the requirements

of Paragraph C (for "medically documented history of a chronic affective

disorder").  20 C.F.R. Part 404 Appendix 1, § 12.04.  Paragraph C requires

showing: "Medically documented history of a chronic affective disorder of at least

2 years' duration that has caused more than a minimal limitation of ability to do

basic work activities, with symptoms or signs currently attenuated by medication

or psychosocial support, and one of the following: 1. Repeated episodes of

decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." Id.

To meet Listing 12.06, a claimant must satisfy the requirements in both Paragraphs A and B, or both Paragraphs A and C. Id. § 12.06. Paragraph C requires a level of severity resulting "in complete inability to function independently outside the area of one's home." Id.

Because Plaintiff clearly has not demonstrated that he meets the criteria of Paragraph C of either listing, the Court evaluates whether substantial evidence supports the ALJ's conclusion that Plaintiff did not meet the criteria of Paragraph B in either listing.

To satisfy paragraph B of Listing 12.04 or 12.06, the claimant must have demonstrated that his disorder resulted in at least two of:

　　1. Marked restriction of activities of daily living;

　　2. Marked difficulties in maintaining social functioning;

　　3. Marked difficulties in maintaining concentration, persistence, or pace; or

　　4. Repeated episodes of decompensation, each of extended duration.

Id. §§ 12.04, 12.06.[4] A marked limitation means more than moderate but less than

---

[4] These were the factors that the ALJ should have considered at the time of Plaintiff's hearing. The factors have since been modified. See, e.g., 20 C.F.R. § 404.1520a (2017) (stating that in evaluating mental impairments, the Social Security Administration has "identified four broad functional areas in which [it] will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself"). Plaintiff references the 2017 regulations. See JS at 71.

extreme. Id. at § 12.00(c). A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the claimant's ability to function independently, appropriately, effectively, and on a sustained basis. Id.

The line between what constitutes a "marked" versus a "moderate" impairment is not a bright one, but the ALJ's finding must be supported by substantial evidence. Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter, 504 F.3d at 1035. It is more than a scintilla, but less than a preponderance. Id. (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick, 157 F.3d at 720. "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

For example, in Lang v. Colvin, No. 10-03507, 2014 U.S. Dist. LEXIS 137852, at *58-62 (N.D. Cal. Sep. 26, 2014), the ALJ's finding that Lang's impairments in the area of social functioning and concentration were only "moderate" were not supported by substantial evidence where there was "no evidence in the record of Lang maintaining friendships," her treating physician opined that she had "lost most of her interest in other people or things," and she was fired from her prior employment for "repeatedly sleeping" on the job. In contrast, in May v. Comm'r of the SSA, No. 12-02735, 2013 U.S. Dist. LEXIS 77081 (N.D. Cal. May 31, 2013), the district court affirmed the ALJ's finding of only moderate limitations based on the following evidence:

> Some evidence in the record shows that Plaintiff was able to interact
> with people, e.g. with her grandmother, with her doctors, with

authority figures, and with storekeepers and clerks and others while on shopping trips for shoes, clothes, and groceries while in the presence of her mother.  Other evidence in the record points to Plaintiff's isolation and difficulty in interacting independently with the public, and her inability to function outside her home.  On balance, as a reasonable mind could agree with the conclusion reached by the ALJ that Plaintiff's difficulties in maintaining social functioning were only "moderate," the determination was supported by substantial evidence in the record.

Id. at *31; see also Deal v. Comm'r of SSA, No. 15-2697, 2017 U.S. Dist. LEXIS 49814, at *9 (E.D. Cal. Mar. 31, 2017) (holding ALJ reasonably found claimant did not have "a marked impairment with the abilities … to do most jobs in 2010 when she was working at a semi-skilled job two years prior ….").

### 3.    Plaintiff's Claimed Errors.

Plaintiff argues that the ALJ "incorrectly found only 'moderate' restrictions in social functioning and concentration, persistence, and pace (AR 32) the same as SSA's state examiners (AR 69-70)."  JS at 28.  For Listing 12.04, Plaintiff cites to various records as establishing that Plaintiff meets Paragraph A.  JS at 70-71.  He then cites records that purportedly show he has extreme or marked limitations satisfying Paragraph B.  JS at 71-72.  Plaintiff provides a similar analysis for Listing 12.06.  JS at 72-73.  He argues that the ALJ should have accepted Ms. Lletget's assessment of Plaintiff, which "satisfies the criteria for Listings 12.04 and 12.06" because she described "marked" limitations in the relevant functional areas. JS at 25-26, citing AR 456-60.

Plaintiff also argues that Ms. Lletget assessed Plaintiff as having a Global Assessment of Functioning ("GAF") score of 42, indicating that Plaintiff was "incapable for working" and suffered a "listing-level impairment."  JS at 4, 73-74.

/ / /

**4. The ALJ's Step Three Analysis.**

Regarding Listings 12.04 and 12.06, the ALJ found that Plaintiff failed to meet Paragraphs B or C, as follows:

> As explained/justified later in this writing, under "B" criterion rating the severity of mental impairments, the ALJ finds the combination of claimant's affective disorder (depression) (Listing 12.04) and anxiety disorder (Listing 12.06), results in "mild" to "moderate" restriction in his activities of daily living; "moderate" difficulties in his abilities to maintain social functioning and to maintain concentration, persistence, or pace, and has not resulted in any episodes of decompensation, each of an extended during. The claimant does not satisfy 12.04 or 12.06 C criterion.

AR 32. The ALJ discussed the low GAF score that Ms. Lletget initially assigned to Plaintiff, but also discussed the medication he subsequently received and his reports that he was doing better. AR 35.

**5. Paragraph B Criteria Relevant to Plaintiff's Claimed Errors.[5]**

    a.    Criterion (2): Maintaining Social Functioning.

This criterion refers to the capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. A claimant can demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. The claimant may exhibit strength in social functioning by such things as his ability to initiate social contacts with others, communicate clearly with

---

[5] In discussing only three of the Paragraph B criteria, the Court reaches no conclusion on the fourth.

others, or interact and actively participate in group activities. An ALJ should also consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers. 20 C.F.R. Part 404 Appendix 1, § 12.00(C)(2).

Some evidence in the record shows that Plaintiff's dislikes interacting with others. See, e.g., AR 56 (Plaintiff's hearing testimony); AR 456-60 (mental disorder questionnaire by Ms. Lletget). Other evidence, however, shows that Plaintiff can interact with others when motivated to do so. See, e.g., AR 52, 460 (starting in 2012, Plaintiff attended therapy sessions with Ms. Lletget once or twice a month); AR 405 (in 2005, Plaintiff helped a friend push a stolen car in San Diego and served 2½ months in jail); AR 405 (in 2012, Plaintiff told Ms. Lletget he "temporarily stays in Mexico" sometimes); AR 221 (Plaintiff shops at Walmart on a monthly basis); AR 54, 220-22 (Plaintiff maintains a relationship with his mother with whom he lives; she cooks for him and takes him to medical appointments); AR 225-26 (per his mother, he gets along with authority figures and his impairments do not affect his ability to get along with others); AR 48, 230 (per his hearing testimony, from 2000-2005, Plaintiff maintained employment as a call center clerk, and this job required him to answer phones and supervise 15 people[6]).

_____

[6] The exact dates of Plaintiff's employment at the call center are unclear. In one form, Plaintiff reported working at the call center from January 2004 through August 2008, then working as a furniture mover from March 2008 through June 2010. AR 193. For the moving job, Plaintiff worked fulltime, standing up to 7 hours each day and frequently lifting up to 80 pounds. AR 229, 239. A medical report from 2012 records that Plaintiff worked as a call taker "2 years ago," i.e., in 2010. AR 396. This is consistent with Plaintiff's claim that he became unable to work in July 2010. AR 147, 169. Elsewhere, Plaintiff claimed that he stopped working in 2008. AR 191-92. Ms. Lletget recorded that Plaintiff worked as a call

28

As part of his care plan, Ms. Lletget urged Plaintiff to "engage in a conversation with his neighbor on a daily basis to help improve mood." AR 399.

Considered collectively, this is sufficient evidence to support the ALJ's finding that Plaintiff's impairments only cause "moderate" limitations in social functioning.

> b.     Criterion (3): Maintain Concentration, Persistence, and Pace.

This area of mental functioning refers to the abilities to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. The ALJ looks not at the specific number of tasks that a claimant is unable to complete, but the nature and overall degree of interference with function. For example, the claimant may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if a claimant can complete many simple tasks, an ALJ may nevertheless find that he has a marked limitation in concentration, persistence, or pace if he cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions. 20 C.F.R. Part 404 Appendix 1, § 12.00(C)(3).

The ALJ found that Plaintiff had "moderate" limitations in this area and therefore restricted him to simple, repetitive work that is not fast-paced. AR 37.

---

taker "from 2001-2005" after which he "worked odd jobs on occasion." AR 405. This is consistent with Plaintiff's hearing testimony that his last job was in 2005 as a call taker, and he held that job for five years. AR 48. He did not remember what year(s) he moved furniture. AR 49. Other records show that Plaintiff received compensation from 1999-2003. AR 179-81. Based on these records, Plaintiff now claims he was terminated from the call center in 2003. JS at 27.

The ALJ, however, did not find that his limitations were "marked" so as to preclude any kind of work. The ALJ found persuasive the fact that although Plaintiff's mental impairments had existed since childhood, he was still able to maintain satisfactory employment at the call center for five years. AR 32, 35, relying on AR 48, 56, 59. The ALJ did not error in relying on Plaintiff's demonstrated work history to find that his mental impairments only "moderately" limit his ability to maintain concentration, persistence and pace.[7]

    c.  Criterion (4): Episodes of Decompensation.

   Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode. The term "repeated episodes of decompensation, each of extended

---

[7] GAF scores are not dispositive of whether a claimant is functionally impaired. McFarland v. Astrue, 288 Fed. App'x 357, 359 (9th Cir. 2008) ("The Commissioner has determined the GAF scale 'does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings'" citing 65 Fed. Reg. 50,746 and 50,765 (Aug. 21, 2000)); Macias v. Colvin, 2016 U.S. Dist. LEXIS 41711 at *24 (E.D. Cal. Mar. 29, 2016) (citing authorities deeming GAF scores unreliable). Thus, the ALJ's findings regarding Plaintiff's concentration, persistence and pace were not undermined by Ms. Lletget's assignment of a low GAF score.

duration" means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If a claimant has experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, the ALJ must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence. 20 C.F.R. Part 404 Appendix 1, § 12.00(C)(4).

Plaintiff does not cite to anything in the record suggesting repeated episodes of decompensation of extended duration.

Because substantial evidence supports the ALJ's finding that Plaintiff is only moderately limited in three of the four Paragraph B criteria, the ALJ did not err in determining that Plaintiff does not satisfy Listing 12.04 or 12.06.

**E.      ISSUE FIVE:  Did the ALJ err in discounting the testimony of lay witnesses?**

**1.      Rules for Evaluating Lay Witnesses' Opinions.**

A lay witness statement can be rejected so long as an ALJ provides a germane reason, which can be the same reason given for rejecting a claimant's statements. Valentine v. Astrue, 574 F.3d 685, 694 (9th Cir. 2009) (because ALJ gave valid reasons for rejecting claimant's complaints regarding disabling nature of fatigue and "because the wife's testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting her testimony").

Even if an ALJ errs in his or her treatment of lay testimony, a "decision of the ALJ will not be reversed for errors that are harmless." Burch, 400 F.3d at 679. Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination." Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006); Ash v. Berryhill, 676 F. App'x 632, 633 (9th Cir. 2017) ("[T]he ALJ erred in failing to address the lay witness's statement, but this error was harmless

because the witness did not describe any limitations beyond those that Ash described herself.")

### 2. The Parties' Arguments.

Plaintiff argues that the ALJ erred by failing "to provide *any* reasons let alone *germane* reasons for rejecting" the testimony of Plaintiff's mother and brother, Carlos. JS at 79. Plaintiff identifies Carlos's testimony as a Form SSA-3441. JS at 78-79, citing AR 254-58. Plaintiff identifies Plaintiff's mother's testimony as an adult function report she completed on September 6, 2012 (AR 220-227) and another Form SSA-3441 (AR 280-84). JS at 79.

The Commissioner concedes that the ALJ did not mention Plaintiff's brother or mother, but argues the omission is not error because his family members reported limitations "largely similar" to Plaintiff's subjective complaints. JS at 80. Alternatively, any error was harmless, because the primary reason the ALJ gave for not fully crediting Plaintiff's testimony (i.e., Plaintiff could work at the call center even before receiving treatment for his mental health impairments) applies equally to the testimony of his brother and mother. Id.

### 3. Analysis.

First, it does not appear that Plaintiff's brother or mother completed the referenced SSA-3441 forms. The forms are addressed to "you," the claimant. AR 254, 280. The forms ask, "Give the name of a friend or relative that we can contact … who knows about your illness …." Id. One form identifies Carlos as someone who can be contacted, while the other form identifies Plaintiff's mother. Id. There is no indication, however, that the information in the other sections of the form was supplied by anyone other than Plaintiff. The first form says it was completed via the Internet by Carol Behpour in Simi Valley and the second completed by Health Advocates in Sherman Oaks. AR 259, 284. These appear to be people or agencies who assisted Plaintiff by typing information and submitting the forms online. Since Plaintiff has not identified any testimony in the record

from his brother, the ALJ did not err by not discussing Carlos's testimony.

Regarding the function reports, the ALJ noted that Plaintiff feels unable to do anything, dislikes people, lives with his parents, stays in his room most of the time, cleans his room, and helps with the trash. AR 34, citing Ex. 4E (AR 208-27, which includes his mother's report at AR 220-27). His mother reported that he "is mostly in his room," has a big hernia that "does not allow him to do much," suffers from anxiety and depression, goes out about once a month, has poor vision, and has "no desire to do anything." AR 220-27. The ALJ discussed all these assertions in her decision and gave reasons for rejected them (e.g., inconsistent with Plaintiff's work history, inconsistent with Plaintiff's treatment records reporting improvement with medication), as discussed above. The ALJ, therefore, did not commit error (and certainly not prejudicial error) in failing to discuss separately Plaintiff's mother's function report.

**F.  ISSUE SIX:  Did the ALJ err by finding some of Plaintiff's impairments non-severe?**

Plaintiff contends that the ALJ erred by finding his "learning and panic disorders, hallucinations, headaches, difficulty breathing, sleep apnea, fatigue, and visual problems" were not severe. JS at 21.

**1.  Step Two of the Sequential Evaluation Process.**

Once a claimant has shown that he suffers from a medically determinable impairment, he next has the burden of proving that these impairments are "severe." Edlund v. Massanari, 253 F.3d 1152, 1160-61 (9th Cir. 2001). An impairment is "severe" if it significantly limits a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 416.920(c). Basic work activities are the abilities and aptitudes necessary to do most jobs. 20 C.F.R. § 416.921(b). Examples of physical work activities include walking, standing, sitting, reaching and carrying. Id. A severe impairment is one that has "more than a minimal effect on the individual's ability to do work." Social Security Ruling ("SSR") 96-2p.

Conversely, an impairment is "non-severe" if it does not significantly limit a claimant's ability to perform basic work activities. 20 C.F.R. § 416.921(a). If a claimant does not have a medically determinable impairment that is "severe" over a period of at least 12 consecutive months, then the claimant is not disabled. 20 C.F.R. § 416.909.

The ALJ must consider the combined effect of all the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe. 42 U.S.C. § 423(d)(2)(B); SSR 86-8, 85-28. The ALJ must also consider the claimant's credible subjective symptoms, such as pain or fatigue, in determining severity. SSR 88-13; 20 C.F.R. § 416.920(c). "The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." Bowen v. Yuckert, 482 U.S. 137, 153 (1987).

### 2. Analysis of Each Allegedly Severe Condition.

#### a. Learning Disorder.

The ALJ determined, "while the evidence does not establish a learning disorder, any such condition has not prevented the claimant from working competitively in the past and would not prevent similar work in the future …." AR 31. Plaintiff argues that his prior work at the call center cannot be characterized as "competitive," because he only received compensation commensurate with "substantial gainful employment" for two years. JS at 44. In this context, however, "competitive" employment simply means that Plaintiff's work setting was not sheltered; he was required to perform the same tasks as other employees.

Next, Plaintiff argues that he was "terminated from his simple repetitive job for being 'too slow,'" undercutting the ALJ's logic that his past work demonstrates his learning difficulties do not preclude him from even simple, repetitive work. JS

34

at 45. As discussed above, when asked at the hearing why he stopped working, Plaintiff testified that the company moved, and the ALJ was entitled to rely on this testimony.

### b. Panic Disorder.

The ALJ found, "the weight of the evidence does not support a panic disorder or agoraphobia but a generalized anxiety disorder, perhaps with some remnants of posttraumatic stress disorder (PTSD)." AR 31. Due to this finding, the ALJ included limitations in Plaintiff's RFC to reduce workplace stress, such as limited contact with co-workers, no face-to-face contact with the public, no fast-paced working environments, and only simple, repetitive work. AR 37.

Plaintiff has not explained why the restrictions in the RFC would have been any different if the ALJ had considered Plaintiff to have a "panic disorder" versus an "anxiety disorder." The thrust of Plaintiff's argument seems to be that the ALJ should have accepted Plaintiff's testimony that his anxiety/panic disorder so markedly impairs his functioning that he cannot consistently go to a jobsite or interact with others. As discussed above, the ALJ gave specific reasons supported by substantial evidence for determining that Plaintiff can leave his house and interact with others when sufficiently motivated to do so.

### c. Hallucinations.

The ALJ found, "while the weight of the evidence does not establish a psychotic disorder or component, any related symptoms that might be credited (e.g., hallucinations) appear to have been controlled or to have dissipated." AR 31.

At the hearing, Plaintiff testified he experienced visual and auditory hallucinations, and that his medications did not help much. AR 57-59. While Plaintiff told SFMHC at his 2012 intake appointment that he started hearing voices about three years earlier and "vaguely report[ed] visual hallucinations" (AR 529), Ms. Lletget did not observe him experiencing hallucinations (AR 528) and he declined to take antipsychotic medication (AR 434). In 2014, Dr. Yegiazaryan

noted Plaintiff was "logical, not delusional." AR 528; see also AR 517 (May 12, 2014 record saying Plaintiff was "doing well"). As discussed above, the ALJ's finding that his mental health improved after he started taking medication is supported by substantial evidence.

Ultimately, Plaintiff fails to point to any acceptable medical source who diagnosed Plaintiff as having a medically determinable psychotic disorder likely to cause hallucinations. He similarly fails to point to any evidence other than his own discredited testimony tending to show that he experiences hallucinations so often that they would impair his ability to work. Thus, the ALJ did not err in finding that Plaintiff's hallucinations are not a severe impairment.

d.     Headaches and Difficulty Breathing.

A "medically determinable impairment" is one shown to exist by medical signs and laboratory findings. 20 C.F.R. § 404.1529(b) ("[S]ymptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present.") Headaches and difficulty breathing are symptoms, not impairments. The ALJ "considered the claimant's complaints of headaches, difficulty breathing and dizziness in her assessment of symptoms," but found "there is no showing of a medically determinable cardiac, respiratory or neurological" impairment. AR 31.

Regarding headaches, Plaintiff still does not point to any medical signs or laboratory findings showing that he suffers from a neurological impairment likely to cause headaches. Instead, Plaintiff cites to his subjective complaints. JS at 5, citing AR 526 (Ms. Lletget's initial assessment recording Plaintiff's complaint of "constant headaches"); JS at 10, citing AR 254 (Plaintiff's February 2013 SSA-3441 form saying "headaches are worse"); JS at 79, citing AR 280 (subsequent SSA-3441 form saying headaches are "new" as of March 2013). As discussed above, the ALJ did not err in discounting Plaintiff's subjective complaints.

36

Regarding difficulty breathing, the ALJ did consider Plaintiff's obesity, a condition likely to cause shortness of breath. AR 32. Plaintiff has not pointed to any medical evidence (like a respiratory function test) that his daytime breathing difficulties are so serious that they more than minimally affect his ability to work.

### e. Sleep Apnea and Fatigue.

The ALJ found, "the claimant apparently has sleep apnea and relates related fatigue (Ex. 4F[8]). However, he now uses a CPAP machine, with acknowledged benefit (testimony), and little in the medical documents suggests ongoing subjective or objective concerns or limited functioning." AR 31.

In 2012, Plaintiff told Dr. Huthsteiner that he experiences "anxiety in the night when he has trouble breathing." AR 434. In May 2013, Plaintiff underwent a sleep study and was diagnosed with obstructive sleep apnea. AR 6, 542. At the 2014 hearing, Plaintiff testified that he uses a CPAP machine. AR 54. He testified that the machine helps, but "sometimes [his] mind keeps [him] up." Id.

On this record, substantial evidence supports the ALJ's finding that Plaintiff's sleep apnea is not severe. See Casteneda v. Colvin, No. 14-1903, 2015 U.S. Dist. LEXIS 71359, at *9 (E.D. Cal. June 2, 2015) (upholding ALJ's determination that claimant's "sleep apnea [was] not severe when he used a CPAP machine"). There is no evidence that when using a CPAP machine, Plaintiff experiences sleep apnea-related daytime drowsiness that more than minimally affects his ability to work.

### f. Vision Problems.

Regarding Plaintiff's vision, the ALJ found as follows:

The claimant relates having visual problems since childhood. …

---

[8] Per this exhibit, in September 2012, Dr. Lim noted that Plaintiff has had "sleep apnea since June 2011" with "fatigue due to sleep apnea," but he was not using a CPAP machine at that time. AR 395, 398.

A consultative examination showed reduced visual acuity, with some correction on pinhole, but no testing with glasses. However, examination of the eyes was unremarkable. It appears that the acuity deficits are correctable. In any event, the claimant moved about freely during the examination (Ex. 4F [AR 398]). Any visual concern did not prevent the claimant from working as a transportation clerk for 4 to 5 years (or from other employment) and was not a reason for his termination, and there has not been any material change since. In sum, any visual concern does not appear to affect the claimant's work capacity. Given these factors, the ALJ rejects the State agency limits on depth perception (Ex. 3A). However, even if the claimant were precluded from jobs requiring precise vision, this would not alter the ALJ's decision.

AR 31-32. In other words, the ALJ reasoned that since Plaintiff's vision deficits have not changed since he worked at the call center, his vision deficits would not preclude him from doing that work again. Plaintiff has not identified anything in the record that undermines this reasoning, and thus fails to show prejudicial error.[9]

## G. **ISSUE SEVEN: Did the Appeals Council err in refusing to admit some of Plaintiff's new evidence?**

### 1. **Rules Governing New Evidence.**

A claimant may ask the Appeals Council to review an adverse decision by an ALJ. The Appeals Council will review the ALJ's decision if it receives evidence "that is new, material, and *relates to the period on or before the date of*

---

[9] Plaintiff reported he has no driver's license because of his "bad vision." AR 211; see also AR 54. Court records submitted by Plaintiff, however, list a California driver's license number for him. Dkt. 34-2 at 2. The superior court may have listed Plaintiff's California identification number as a driver's license number. AR 145 (illegible copy of identification card).

*the hearing decision*, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5) (emphasis added). Per the regulations, if a claimant submits "additional evidence that does not relate to the period *on or before the date of the administrative law judge hearing decision* …, the Appeals Council will send" the claimant a notice that explains why it did not accept the additional evidence. 20 C.F.R. § 404.970(c) (emphasis added).

If the Appeals Council declines to accept one or more pieces of additional evidence (as happened in this case [see AR 2]), or if Plaintiff obtains new evidence after the Appeals Council's decision (as also happened in this case [see JS at 91]), then the claimant can ask the district court to remand the case to permit the ALJ to consider the new evidence. Remand is appropriate if (1) the new evidence is "material" and (2) there is "good cause" for the failure to incorporate such evidence in the record in a prior proceeding. Burton v. Heckler, 724 F.2d 1415, 1417 (9th Cir. 1984) (citing 42 U.S.C. § 405(g)).

"To demonstrate good cause, the claimant must demonstrate that the new evidence was unavailable earlier." Mayes v. Massanari, 276 F.3d 453, 463 (9th Cir. 2001); see also Key v. Heckler, 754 F.2d 1545, 1551 (9th Cir. 1985) ("If new information surfaces after the Secretary's final decision and the claimant *could not have obtained that evidence at the time of the administrative proceeding*, the good cause requirement is satisfied.") (emphasis added).

To be material, the new evidence must bear "directly and substantially on the matter in dispute." Mayes, 276 F.3d at 462 (holding no remand required where claimant failed to demonstrate that "the [back] condition diagnosed in November 1997 [and discussed in the new evidence] even existed when the ALJ hearing was held in May 1997"). This means it must be probative of the claimant's condition at or before the time of the disability hearing. Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 511 (9th Cir. 1988) (citing 20 C.F.R. § 404.970(b))

(holding evidence of "mental deterioration after the hearing … would be material to a new application, but not probative of his condition at the hearing"). Materiality also requires plaintiffs to "demonstrate that there is a reasonable possibility that the new evidence would have changed the outcome of the administrative hearing." Mayes, 276 F.3d at 463.

### 2. Factual Background of Plaintiff's New Evidence.

#### a. Dr. Yegiazaryan's Opinions.

The Appeals Council accepted three new records into evidence: (1) a March 29, 2015 letter brief from Plaintiff's lawyer (AR 6, citing Ex. 15E [AR 294-97]); (2) an April 4, 2015 letter from Plaintiff (id., citing Ex. 16E [AR 299]); and (3) a May 29, 2013 sleep apnea study from Olive View Medical Center (id., citing Ex. 12F [AR 542-43]).

The letter brief cites extensively to an opinion from Dr. Yegiazaryan dated February 24, 2015. AR 294. The Appeals Council expressly declined to make Dr. Yegiazaryan's February 24, 2015 opinion part of the record, reasoning as follows:

> The [ALJ] decided your case through November 20, 2014. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before November 20, 2014. If you want us to consider whether you were disabled after November 20, 2014, you need to apply again.

AR 2.

Plaintiff argues that the Appeals Council should have accepted Dr. Yegiazaryan's February 24, 2015 opinion as new evidence. JS at 91. It was not attached as an exhibit to the Joint Stipulation. When the Court invited Plaintiff to lodge this opinion, Plaintiff filed a Notice of Lodgment identifying the first attachment as "Dr. Yegiazaryan's 2/24/15 Mental Medical Source Statement." Dkt. 34 at 1.

The actual exhibit, however, is a Mental Medical Source Statement by Dr.

40

Yegiazaryan dated November 13, 2015. Dkt. 34-1 at 7. Dr. Yegiazaryan's February 2015 opinion was apparently different from her November 2015 opinion. For example, Plaintiff's March 2015 letter brief (which cites the February opinion) says that Dr. Yegiazaryan assigned Plaintiff a GAF score of 45. AR 294. In contrast, Dr. Yegiazaryan's November 2015 opinion says Plaintiff's current GAF score is 42 and his "highest GAF past year" was also 42. Dkt. 34-1 at 2. Other quoted portions are similar, but not identical. Compare AR 294 (block quote from page 1 of February 2015 opinion) with Dkt. 34-1 at 2 (page 1 of November 2015 opinion). The two opinions do not report the same symptoms or assess the same limitations. Compare AR 295 (February 2015 opinion said Plaintiff suffers from "blunt, flat or inappropriate affect," "psychomotor agitation or retardation," and "motor tension") with Dkt. 34-1 at 3 (November 2015 opinion does not check those boxes); AR 295 (February 2015 opinion said Plaintiff was "seriously limited" in performing various activities) and Dkt. 34-1 at 4-5 (November 2015 opinion does not check "seriously limited" for any activity; all are rated "unable to meet competitive standards").

Dr. Yegiazaryan's November 2015 opinion is a "Mental Medical Source Statement" form. Dkt. 34-1. In that form, she estimated that she saw Plaintiff once a month from April 2012 through the date she completed the form. Id. at 2. She diagnoses Plaintiff with (1) major depressive disorder, (2) panic disorder with agoraphobia, and (3) PTSD. Id. She reported that he experienced no side effects from his medication, but he nevertheless had a "poor response to treatment." Id.

Two pages of the form consist of charts listing work-related activities and checkboxes rating the degree of limitation for each activity "on a day-to-day basis in a regular work setting." Id. at 4. The potential ratings are (1) unlimited or very good, (2) limited but satisfactory, (3) seriously limited, (4) unable to meet competitive standards (defined as "noticeable difficulty … from 21-40 percent of the workday or workweek"), and (5) no useful ability to function. Id. For all

twenty-five of the activities listed, Dr. Yegiazaryan rated Plaintiff "unable to meet competitive standards." Id. at 4-5. These include basic activities such as understanding and remembering "very short and simple instructions," making "simple work-related decisions," asking "simple questions," maintaining socially appropriate behavior, and using public transportation. Id.

Under the charts, the form asked for an explanation of the "three most limited categories" including the "medical/clinical findings that support this assessment." Id. For each of the three charts, Dr. Yegiazaryan left the explanation section blank. Id.

The form is identified as a "medical source … from Dr. Yegiazaryan." Id. at 2. The signature on the opinion is illegible, but the printed name is clearly Dr. Yegiazaryan. Id. at 7. The printing, however, greatly resembles that of social worker Ms. Lletget, and the author misspelled the doctor's name, "Yegiazarayn." Compare AR 403, Dkt. 34-1 at 2 (the word "mother"), AR 404, Dkt. 34-1 at 2 (the date "4/24/12"), AR 460, and Dkt. 34-1 at 7 (address and printed name of Dr. Yegiazaryan) with AR 429 (Dr. Yegiazaryan's writing).

b. Expungement Records.

Plaintiff also argues that this Court should consider his expungement records, although they were submitted neither to the ALJ nor Appeals Council. Dkt. 34-2. They show that in May 2014, in case no. SCS191131, the San Diego Superior Court granted Plaintiff's motion under California Penal Code § 1203.4 to expunge his conviction for violating California Health and Safety Code § 11359 (possession of marijuana for sale[10]). Per the superior court's online records, the

_____

[10] The Joint Stipulation characterizes Plaintiff's criminal case as "a car theft charge." JS at 12. Counsel apparently relied on Ms. Lletget's note that Plaintiff told her he was arrested for "helping friend push [a] car that [he] did not know … was stolen." Id., citing AR 405. The superior court records, however, reference a "violation of HS11359." Dkt. 34-2 at 1. It is unclear if Plaintiff's criminal case

criminal case against Plaintiff was filed in February 2005.

Plaintiff argues these records are "critical" because they disprove the ALJ's assertion that he lost his call center job for reasons unrelated to his job performance. JS at 27, 48, citing AR 33 ("He denied having any problems on the job(s) (testimony), explaining it ended when the company moved (testimony), with other evidence suggesting he was incarcerated [citing AR 405].").  Per Plaintiff, the expungement records confirm his arrest occurred in 2005, making it more likely that he lost his call center job in 2003 (the last year he showed earnings) because he was too slow, not in 2005 because he was arrested.[11]  Id.

### 3.    Dr. Yegiazaryan's February 24, 2015 Opinion.

The Court assumes that Dr. Yegiazaryan's February 2015 opinion is as represented in Plaintiff's letter brief.  AR 294-297.  Even making that assumption, Plaintiff fails to make the showing necessary for remand.

First, Plaintiff fails to demonstrate "good cause" for his failure to obtain an opinion about his functionality from Dr. Yegiazaryan prior to the ALJ's November 2014 decision.  Her treating relationship with Plaintiff started in 2012.  AR 433.  She saw Plaintiff once a month.  Dkt. 34-1 at 2.  Plaintiff retained counsel to assist him in his disability case in June 2013.  AR 97-98.  Ms. Lletget completed a questionnaire in 2013.  AR 457-60.

Plaintiff argues it is sufficiently "good cause" that the opinion did not exist until it was written in February 2015.  JS at 93.  This fails to demonstrate that an opinion about Plaintiff's functionality was not available earlier from Dr. Yegiazaryan, had she been asked to provide one.  Good cause requires reasonable diligence, particularly when a party is represented by counsel.  Mayes, 276 F.3d at

---

involved multiple charges against Plaintiff and his co-defendant.

[11] The Court is skeptical of this reasoning.  The ALJ already believed that Plaintiff was arrested in 2005.

463 ("The claimant must also establish good cause for not having sought the expert's opinion earlier); <u>Sanchez</u>, 812 F.2d at 512 (holding that the applicant lacked good cause to remand for consideration of two psychological examinations prepared after the applicant's disability determination when his attorney knew of the applicant's memory loss but failed to explain why the applicant had not requested a mental evaluation earlier). The Joint Stipulation lacks any explanation as to why Dr. Yegiazaryan was not asked to complete a Mental Medical Source Statement form earlier.

Second, Plaintiff has not shown that Dr. Yegiazaryan's February 2015 opinion is probative of his condition prior to the ALJ's opinion, as opposed to documenting a decline in his condition after the ALJ's decision. The date of a medical opinion is not dispositive of whether it "relates to the period on or before the date of the hearing decision" for purposes of 20 C.F.R. § 404.970(a)(5). For example, in <u>Taylor v. Comm'r of SSA</u>, 659 F.3d 1228, 1233 (9th Cir. 2011), the Ninth Circuit found that the Appeals Council had improperly failed to consider a medical source opinion that post-dated the ALJ's decision. The Ninth Circuit reasoned that the doctor's opinion "related to" Taylor's mental health before the ALJ's decision because (1) it addressed the same mental impairments considered by the ALJ, (2) the doctor had treated Taylor for many years, including two examinations before the ALJ's opinion, and (3) the doctor supervised the licensed nurse practitioner who treated Taylor. <u>Id.</u> at 1232-33.

Nevertheless, a medical opinion that describes a deterioration in the claimant's condition after the ALJ's decision is not probative of the claimant's condition during the relevant time period. <u>Smith v. Bowen</u>, 849 F.2d 1222, 1226 (9th Cir. 1988) (contrasting relevant, retrospective medical opinions with irrelevant medical opinions describing "any deterioration in [the claimant's] condition subsequent to" the relevant cutoff date); <u>Hall v. Secretary of Health, Educ. & Welfare</u>, 602 F.2d 1372, 1377 (9th Cir. 1979) (new evidence "was of extremely

doubtful relevance because it was based on an examination eight months after [claimant's] insured status"); Chavolla v. Colvin, No. 13-3943, 2014 U.S. Dist. LEXIS 32132, at *5-6 (C.D. Cal. Mar. 11, 2014) ("Dr. Lane's opinions from July and September 2009 were not probative evidence of plaintiff's limitations during the earlier, relevant period of June 27, 2007, to May 20, 2009….").

The letter brief does not indicate that Dr. Yegiazaryan was asked to confine her assessment to 2014 or render a retrospective opinion. Plaintiff has not submitted Dr. Yegiazaryan's February 2014 opinion for this Court to review. Comparing the letter brief to the November 2015 opinion lodged with the Court, Dr. Yegiazaryan opined that Plaintiff's condition declined in the nine months between February 2015 and November 2015 (e.g., lower GAF score, activity ratings changed from "seriously limited" to "unable to meet competitive standards"). Plaintiff may have experienced a similar decline between November 2014 and February 2015. Indeed, Dr. Yegiazaryan's 2013 and 2014 treating records show that once Plaintiff began to treat his mental impairments with medication, he did better. See, e.g., AR 513 (11/04/13 record that Plaintiff is "doing well" and "less depressed"); AR 515 (08/12/13 record that Plaintiff "does better on meds"); AR 517 (05/12/14 record saying Plaintiff is "doing well"). It is quite a change for Dr. Yegiazaryan to opine in 2015, "poor response to treatment." Dkt. 34-1 at 2.

The Joint Stipulation does not discuss why Dr. Yegiazaryan's February 2015 should be viewed as probative of Plaintiff's condition in 2014. In support of his materiality argument, Plaintiff cites Brewes v. Comm'r, 682 F.3d 1157 (9th Cir. 2012). JS at 95. In Brewes, the Appeals Council accepted a new medical opinion drafted after the ALJ's decision, and the Ninth Circuit found that, upon considering the new opinion, the ALJ's decision was not supported by substantial evidence. Id. at 1163. Brewes is inapposite, because the new opinion expressly stated that the claimant's "symptoms had been consistent for about a decade." Id. at 1164. Thus,

45

there was no possibility that the new opinion merely documented a deterioration of the claimant's condition.

Here, the crux of Plaintiff's argument is that his symptoms are getting worse over time, because he contends that he cannot do the work he did in 2005.  See, e.g., AR 208 and 264 (decline between 2012 and 2013 in self-reported activities); AR 254 and 280 (February and March 2013 SSA-3441 forms); AR 525 (in 2012, Plaintiff told Ms. Lletget that his symptoms have "increased last 2 to 3 years").  Given this context and the variability of Dr. Yegiazaryan's opinions over time, this Court cannot conclude that Dr. Yegiazaryan's February 2015 opinion was probative of Plaintiff's condition on or before November 20, 2014.

### 4. Expungement Records.

Plaintiff argues that "good cause exists for not submitting [the expungement records] sooner, as [Plaintiff] did not have the documents."  JS at 48.

The fact that the records were not in Plaintiff's possession prior to the ALJ's decision does not establish good cause.  The expungement records were created in May 2014.  Dkt. 34-2.  The record contained references to Ms. Lletget's attempts to assist Plaintiff with his motion to expunge in January 2013.  AR 428.  Plaintiff has failed to explain why he or his attorney did not obtain his court records earlier.

Regarding relevance, the expungement records are consistent with Plaintiff's testimony that he stopped working in 2005 (AR 48) and Ms. Lletget's notes that Plaintiff stopped working in 2005 and was arrested in 2005 (AR 527).  The expungement records have no tendency to show that Plaintiff stopped working in 2003, or that he was laid off from the call center for being too slow.  While the Court agrees that earnings records show Plaintiff's earnings stopped in 2003, if Plaintiff misspoke at the hearing concerning his last date of employment, then his attorney should have clarified the record at that time.  Having failed to do so, the ALJ was entitled to resolve conflicting evidence by relying on Plaintiff's hearing testimony that he stopped working in 2005 and did so for reasons unrelated to his

job performance.

**H.** **ISSUE EIGHT:  Should this case be reversed for the payment of benefits or remanded for additional proceedings?**

Having found no legal error, this issue is moot.

**IV.**

**CONCLUSION**

For the reasons stated above, the decision of the Social Security Commissioner is AFFIRMED.

Dated:  <u>November 15, 2017</u>

KAREN E. SCOTT
United States Magistrate Judge